## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 21-cr-0206 (WMW/HB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Walter Davis, | |
| Defendant (1). | |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Defendant Walter Davis' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [ECF No. 28] and Motion to Suppress Evidence Obtained Through Wire Interceptions, Electronic Surveillance and Other Evidence [ECF No. 30[1]].  The motions were referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that the motions be denied.

## I.   Background and Procedural History

Officers began in March 2021 to investigate Davis's potential involvement in a scheme to smuggle controlled substances into Minnesota prisons in letters soaked or sprayed with the substances.  (ECF No. 43-1 at 2–4.)  During the investigation, officers

---

[1] Defendant filed an exact copy of his motion to suppress electronic surveillance, titled Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, at ECF No. 29.  To avoid confusion, the Court will discuss only ECF No. 30 and will recommend that ECF No. 29 be denied as moot.

applied for and received multiple warrants to track a phone number and vehicle, and to search residences, electronic devices, a social media account, and a cash handling application account associated with Davis.  (Mot. Hr'g Ex. List [ECF No. 44].)  An Indictment was filed against Davis on September 28, 2021, charging him with attempted distribution of a controlled substance and possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841, and two counts of felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(l) and 924(a)(2).  (ECF No. 1.)

Davis initially challenged the admissibility of evidence seized under 13 search warrants issued in the course of the investigation.  (ECF Nos. 28, 30.)  The Court held a hearing on the motions on December 22, 2021, during which the Government submitted the following exhibits:

- Tracking Warrant for Cell Phone Ending -8114 (Ramsey County) (Gov't Ex. 1)
- GPS Tracking Warrant for Chevy Tahoe (Dakota County) (Gov't Ex. 2)
- Warrant to Search CashApp Account $walterdisney90 (Ramsey County) (Gov't Ex. 3)
- Warrant to Search Six First Class Mail Pieces (federal) (Gov't Ex. 4)
- Warrant to Search Residence on Cinnamon Ridge Trail & Chevy Tahoe (Dakota County) (Gov't Ex. 5)
- Warrant to Search Residence on Beebe Road & Chevy Tahoe (Ramsey County) (Gov't Ex. 6)
- Warrant to Search Defendant's Cell Phone & Computer Equipment (Ramsey County) (Gov't Ex. 7)
- Warrant to Search HP Computer Tower (Ramsey County) (Gov't Ex. 8)
- Warrant for Defendant's DNA (Dakota County) (Gov't Ex. 9)
- Warrant to Search Defendant's Facebook Account (federal) (Gov't Ex. 10)
- Warrant to Search Defendant's Cell Phone (federal) (Gov't Ex. 11)
- Warrant to Search CashApp Account $3kyles (Ramsey County) (Gov't Ex. 12)
- Expanded Warrant to Search Defendant's Cell Phone (federal) (Gov't Ex. 13)

(Mot. Hr'g Ex. List.)  Davis did not submit any exhibits during the hearing.  No witnesses were called by either side.

Davis filed an omnibus post-hearing memorandum in support of his motions on January 19, 2022, in which he narrowed his challenge to four warrants—Government Exhibits 5, 6, 8, and 13—which he submitted with his memorandum as Defendant's Exhibits A, B, C, and D, respectively.  (Def.'s Mem. at 1–2 [ECF No. 43]; ECF Nos. 43-1, 43-2, 43-3, 43-4[2].)  Upon the Court's inquiry, he clarified by letter of January 20, 2022, that he has withdrawn any challenge to the other search warrants.  (ECF No. 46.) The Government responded on February 10, 2022 (Gov't Mem. [ECF No. 47]), and the Court thereupon took the motions under advisement.

The four challenged search warrants allowed, respectively, searches of a residence on Cinnamon Ridge Trail in Eagan, Minnesota; a residence on Beebe Road in Maplewood, Minnesota; an HP computer tower seized from the Beebe residence; and a Samsung Galaxy Note 9 phone seized from the Cinnamon Ridge Trail residence.  (Gov't Exs. 5, 6, 8, 13.)  Davis argues the affidavits officers submitted to support the warrant applications did not provide probable cause to believe that evidence of the drug smuggling scheme and his involvement in that scheme would be found in the locations to be searched, and he asks the Court to suppress the evidence seized.  (Def.'s Mem. at 5–6.)  The Court recounts the details of the affidavits below.

---

[2] For ease of reference, the Court will cite to the government's exhibits in this R&R since those were the exhibits offered and admitted at the hearing.

A. **Warrants to Search Residences on Cinnamon Ridge Trail, Beebe Road, & Chevy Tahoe (Gov't Exs. 5 & 6)**

These two warrants relied on the same substantive facts and nearly identical language in the supporting affidavits, other than non-substantive formatting and grammatical differences. In addition to the residences, both warrants authorized the search of the same Chevrolet Tahoe. (Gov't Exs. 5 & 6.) Officer Justin Wilmes of the Minnesota Department of Corrections (MDOC) averred the following in support of the application for the Cinnamon Ridge Trail warrant (Gov't Ex. 5); Officer Mark Koderick averred the same in support of the application for the Beebe Road warrant (Gov't Ex. 6)[3]:

In March 2021, the MDOC Office of Special Investigations (OSI) opened an investigation into pieces of purportedly legal mail received at Minnesota Correctional Facility (MCF) – Stillwater and MCF – Oak Park Heights. The law offices named on the mailings confirmed they had not sent the items and did not have the intended recipients as clients, and a drug-sniffing dog alerted to the presence of illegal narcotics in or on the mailings received at MCF – Stillwater. (Gov't Ex. 5 at 2–3.) The four mailings shared common traits, such as the named law firms, similar substantive contents about civil litigation and criminal process, the same envelopes, and the same brand of watermarked cotton paper. (*Id.* at 3.) The OSI used a Minnesota National Guard Ion Scanner, proven to detect and identify controlled substances effectively and accurately, to identify methamphetamine in the envelopes sent to MCF – Stillwater. (*Id.*)

---

[3] Except as otherwise noted, the Court will cite to the Wilmes affidavit as exemplary of the facts set forth in both affidavits.

The affiants stated that a common method for introducing controlled substances into a correctional facility is to dry liquid and/or to spray controlled substances onto paper that could later be inhaled, chewed, or licked by an incarcerated person.  (*Id.* at 4.)

OSI began monitoring communications and incoming mail for the prisoners to whom the contraband mailings were addressed, and found continuous calls to an individual named Walter Davis, positively identified through phone calls, pictures sent to MCFs, physical surveillance, and a MCF "JPay" email and money account.  (*Id.*)

While OSI was monitoring the phone calls and JPay messages to Davis, further suspicious mailings arrived at MCFs, sharing the same type of envelope, watermarked cotton paper, song lyrics printed from the website Lyrics Mania, and photos, including some of Davis with others at a party.  (*Id.* at 6.)  The mailings were sent on March 23–29, 2021.  (*Id.*)  The Ion Scanner confirmed the paper and photos tested positive for THC, Cocaine, PCP, and MDMA.  (*Id.*)

In recorded phone calls between Davis and the prisoners to whom the mailings were addressed, Davis confirmed that letters had been mailed.  (*Id.* at 6.)  In an April 2, 2021, phone call with one prisoner, Davis confirmed that he sent a letter on Monday, March 29, 2021.  (*Id.* at 7.)  On April 3, 2021, one of the prisoners called Davis to say that he had not received "it" yet, but other prisoners had "popped up with some but the shit looked white," they "popped up and are holding," and he wanted to make sure "it" had not gone to someone else's mailbox and that it was on the same "demo" and was the same color.  (*Id.*)  Davis confirmed everything about "it" was the same.  (*Id.*)  In a phone call on April 6, 2021, one of the prisoners told Davis that it took him ten days to get the

last one, which closely matched the March 29, 2021, mailing date on the letters stopped

in the MCF mail room. (*Id.*) In a phone call on April 8, 2021, Davis confirmed to one of

the prisoners that "I sent Tyvarus he got his . . . Bree got his shit I didn't send him

photos . . . [Thuz] didn't call but he would have if he didn't get his shit." (*Id.*)

Based on this information, a Ramsey County court authorized a tracking warrant

for a cell phone number known to belong to Walter Davis. (*Id.* at 4.) Information

obtained pursuant to that warrant indicated that Walter Davis was possibly producing the

contraband being sent to the MCFs at an address on Beebe Road in Maplewood, MN, and

an address on Cinnamon Ridge Trail in Eagan, MN. (*Id.*) GPS data from the tracked

phone number placed Walter Davis at the Beebe Rd address on April 5, 2021, and a

recorded phone call between Walter Davis and a MCF – Rush City prisoner that day

contained the sound of blender in the background, indicating he was inside an apartment

at that address. (*Id.* at 5.) The affiants stated that blenders are commonly used to add

cutting agents to narcotics. (*Id.*) During the call, Walter Davis stated he had mailed

"demo kits" to the prison. (*Id.*) In a phone call with a different prisoner on April 6,

2021, Davis confirmed he was at the Beebe building, and when the prisoner asked if he

was at work already, he said he was "putting shit together." (*Id.*) In a phone call with a

different prisoner that same day, Davis confirmed that he had not left the spot yesterday.

(*Id.*) In yet another phone call with a different prisoner that day, Davis stated, "I got my

own crib here already. . . . I had this crib for almost two years now." (*Id.* at 6.) GPS

data placed the tracked cell phone number belonging to Davis at the Beebe building

overnight April 5 – 7, 2021. (*Id.* at 5.)

6

On April 6, 2021, Wilmes and another officer followed Davis in a 2007 maroon Chevrolet Tahoe to the Cinnamon Ridge Trail residence and observed him enter the residence.  (*Id.*)

Koderick was surveilling the Beebe location on April 8, and observed Davis park the Tahoe there and enter the building with another person.  (*Id.*)  MDOC Officer William Sypniewski, inside the building, observed Davis and the other person enter an apartment using a key fob.  (*Id.*)

Sypniewski spoke with the management of the Beebe building, who confirmed that Davis was entering without their authorization, using a key fob belonging to the apartment's registered tenant, a relative of Davis; Davis had previously been entering the building in September to October 2020;  management had seen him and the relative together on the property in early March 2021; and the relative had not used the key to enter the apartment since March 21, 2021.  (*Id.* at 6.)  Management also provided a contribution form signed by Davis in 2020, and the signature matched that on a form Davis signed in his prison records.  (*Id.*)

On April 9, 2021, Wilmes and another officer executed a warrant, signed by a Dakota County district court judge, for GPS tracking on the Tahoe.  (*Id.* at 7.)  The GPS tracking showed the vehicle frequenting the Cinnamon Ridge Trail address on April 9–13, 15, 2021, and in the Eagan area on April 14, 2021.  (*Id.*)

On April 12, 2021, Davis and one of the prisoners had the following exchange in a recorded call:

> Prisoner: When you going up there?
> Davis: I'm finna go up there in a second.
> Prisoner: Man.
> Davis: I got till 5 its all going out today as long as I get there by 5.
> Prisoners: Man listen, next day, I need the next day action not the priority shit the next day.

(*Id.*)  According to the GPS on the Tahoe and an officer trailing the Tahoe, it drove from the Cinnamon Ridge Trail address to an Eagan post office, where other surveillance officers including Koderick observed Davis leave the vehicle and walk into the post office with mail in hand, then leave the post office and drive away without any mail.  (*Id.* at 7–8.)

Koderick coordinated with the United States Postal Service Postal Inspector and the post office employees to check the mail for letters addressed to MCFs.  (*Id.* at 8.)  He spotted a letter addressed to a prisoner at a MCF in the same style of envelope used for the previous contraband mailings, in the pile of stamped mail beneath only a few other letters.  (*Id.*)  He worked with the Postal Inspector to secure a federal warrant for letters in the pile addressed to prisoners at MCF – Rush City, Stillwater, and Oak Park Heights.  (*Id.*)  The six letters were photographed and secured in an evidence bag.  (*Id.*)

Based on all of the foregoing, Koderick stated his belief that Davis was preparing controlled-substance-soaked paper at the Beebe residence.  (Gov't Ex. 6 at 7.)  Wilmes stated his belief that Davis was placing controlled substances in envelopes at the Cinnamon Ridge Trail residence.  (Gov't Ex. 5 at 8.)  Both stated that Davis was transporting the envelopes to post offices using the Tahoe, and mailing them to prisoners in MCFs.  (*Id.*; Gov't Ex. 6 at 7.)  They further believed that the residences and car would

contain evidence of controlled substances distribution and the fruits thereof.  (Gov't Ex. 5 at 1–2, 8–9; Gov't Ex. 6 at 1–2, 7–8.)  Wilmes requested a warrant to search the Cinnamon Ridge Trail residence and the Tahoe for the described items, and Koderick requested the same for the Beebe residence and the Tahoe.  (Gov't Ex. 5 at 1–2, 8–9; Gov't Ex. 6 at 1–2, 7–8.)

### B.    Warrant for HP Computer Tower (Gov't Ex. 8)

Officer Sypniewski averred the following in support of the warrant to search the HP computer tower seized during the search of the Beebe residence.  (Gov't Ex. 8 at 1, 8.)  Sypniewski included all the facts described in the applications for the residential and vehicle search warrants discussed above.  (*See* Gov't Ex. 8 at 3–8.)  He additionally stated that officers including him executed the search warrant for the Beebe residence on April 16, 2021.  (*Id.* at 8.)  They located in the kitchen several zip lock baggies with a gray substance and several Magic Bullet blenders with white powder residue.  (*Id.*)  Sypniewski's training and experience taught him that these devices are often used to cut and process controlled substances.  (*Id.*)  They found in a hall closet three solid compressed powder-like substances the size of half a baseball, resembling the substance in the zip lock baggies.  (*Id.*)  The substances field-tested positive for heroin and opioid.  (*Id.*)  They also found a loaded revolver in the closet.  (*Id.*)  They also seized the HP computer tower in the residence.  (*Id.*)

Sypniewski stated his belief based on his training and experience that the computer would contain information on the possession and sale of controlled substances and the operation to mail the drug-laced letters to the MCFs; information on the

computer's owner; and proof of residency and documentation related to the internet.  (*Id.* at 1–2, 8.)

### C.    Warrant for Davis's Cell Phone (Gov't Ex. 13)

Officer Sarah Wicker of the United States Postal Inspection Service averred the following in support of the warrant to search a Samsung Galaxy Note 9 phone seized from Davis during the searches of the two residences and Tahoe.  (Gov't Ex. 13 [ECF No. 43-4 at 1, 3, 6–7][4].)  Her experience and training provide her insight into how controlled substances and their sales proceeds are shipped through the U.S. Postal Service.  (*Id.* at 6–7.)  She had previously received a warrant to extract data from the phone dating from January 1, 2021, to the present, and had successfully extracted that data, reviewed it, and sent it to the MDOC officers investigating Davis.  (*Id.* at 7–8.)  However, the application for the warrant in Government Exhibit 13 sought authorization to search the phone and seize data from it dating from January 1, 2020, to the present, that would be evidence of violations of 21 U.S.C. §§ 813, 841, 843, 846 (controlled substance crimes), and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm).  (*Id.* at 7–8.)

Though Wicker describes substantially the same facts as found in the other search warrant applications, she provided more detail and offered some additional facts.  Per her narrative, Davis not only called prisoners but also communicated with them via his JPay

---

[4] This warrant contains several attachments with separate internal pagination, but was submitted as a single PDF to the Court.  The Court cites to the pagination assigned by ECF.

account, and provided various identifications in the calls and messages, such as his CashApp handle. (*Id.* at 9–10.) A phone call between Davis and a prisoner on March 19, 2021, mentioned that Davis was sending the prisoner something that should arrive the next week. (*Id.* at 10.) A mailing arrived for the prisoner on March 26, 2021, containing song lyrics printed on cotton paper and seventeen printed photographs, twelve with Davis, which tested positive for THC, cocaine, and an MDMA analogue. (*Id.*) The same substance showed up in other mailings sent to Davis's associates in MCFs in March 2021. (*Id.*) Recorded calls between February and April 2021 between Davis and another prisoner included further discussions of mailing contraband, including discussions of how something did not "hit" very well, while Davis claimed he "soaked" it; the prisoner tried to heat it up but it did not do anything; another inmate had something strong; Davis purchased absorbent paper; the difference between eating or smoking a substance; Davis should send more so the prisoner has backup; and frequent mention of how to sell and profit from the items. (*Id.*)

Wicker additionally stated the cotton paper in the six envelopes seized from the Eagan post office on April 12 field-tested positive for THC and one for heroin, and lab analysis showed all six contained MDMB. (*Id.* at 11.)

She further stated that Davis was holding the phone when officers entered the Cinnamon Ridge Trail residence with the search warrant, and it was seized from him when he was detained. (*Id.* at 12.) Officers also located on a kitchen table a wallet with identification for Davis next to $3000 in cash and two small baggies with a grey substance that lab tested positive as heroin/fentanyl mix, and in the bedroom additional

documents and cards with Davis's name and a loaded revolver in a top dresser drawer with men's clothing in it. (*Id.*)

The grey and white substances found at the Beebe residence field-tested positive for heroin and lab-tested positive for heroin and fentanyl mix. (*Id.*) The officers also found gloves, plastic baggies, scales, spray bottles, and cotton paper of the brand found in the illicit mailings. (*Id.*) The half-baseball shaped compressed powder substances that field-tested positive for heroin appeared to have been blended in the Magic Bullet blenders. (*Id.*)

Officers also found a letter from the apartment management to the apartment's tenant, Davis's relative, dated September 2020, reprimanding her for letting Davis occupy the unit rather than her. (*Id.*) The letter noted that Davis had been seen using the tenant's key fob consistently since March 2020 along with several unidentified individuals. (*Id.* at 12–13.) The tenant began renting the apartment in August 2019, and Davis signed a contribution form in January 2020 indicating he contributed $200 per month to support the tenant and was paying $700 toward the tenant's past due rent. (*Id.* at 16.) The tenant had infraction notices in September and October 2020 related to letting Davis use the apartment. (*Id.*) Wicker stated that in her training and experience, drug traffickers typically maintain separate residences or storage facilities away from their families and primary residences, where they conduct the drug trafficking activities. (*Id.* at 13.)

Wicker had observed two videos showing firearms from April-May 2021 that Davis had sent via Facebook Messenger, and a Facebook posting to Davis's account

mentioned having a gun.  (*Id.* at 13.)

Wicker further stated that she searched the phone pursuant to the federal warrant authorizing a search for relevant data related to drugs and firearms from January 1, 2021 to present.  (*Id.*)  The data contained a text message to Davis on January 18, 2021, saying, "G can I please hold a half please im sick," to which Davis responds, "Where my money."  (*Id.* at 15.)  From Wicker's training and experience, this appeared to be someone asking Davis for drugs.  (*Id.*)  Another message on January 14, 2021, to "Dizney," a known alias of Davis, said, "They got this K2 oil/spice shit out there that ppl put on paper and gets n****s high AF.  That shit has came thru here twice in the last year and going like hotcakes. . . . I know you got your shit going on and time is spread thin . . . you can have someone else that is competent handle it."  (*Id.* at 15.)  A chat thread between Davis and "Gordon" had a photo and video sent by Davis in March 2021 of what appeared to be someone weighing a brick of drugs at a location recognized as the Beebe residence based on the background and Magic Bullet blenders in the images, and with a voice recognized as Davis's based on Wicker's review of recorded phone calls with Davis.  (*Id.* at 13–14.)  Wicker included in the warrant application screen shots of the images and video.  (*Id.* at 14.)  A message from "Gordon" to Davis on March 20, 2021, stated "Jr. Bonds Is going to give you (2) Gorilla (1) for you. (1) for the Guy in the soda pop.  NOTE: JR.BONDS SAID HE WANT TO GIVE (1) TO SOME BODY HE KNOW AS A SAMPLE."  (*Id.* at 14–15.)  Wicker's training and experience led her to believe this was coded drug talk.  (*Id.* at 15.)  The metadata of the thread showed it dating back to June 5, 2020.  (*Id.*)

The phone also contained texts with a number belonging to another person who admitted to investigators to sending contraband mailings to MCFs, and Davis texted this number in February-March 2021 with a link to a website to buy "Strong Legal K2 Spice" plus contact information for MCF prisoners. (*Id.* at 15–16.) The metadata of the thread showed it dating back to September 5, 2020. (*Id.* at 16.)

A different chat thread contained a message to Davis on April 11, 2021, from "Demolition Loc," telling Davis that he was "at the gun shop" and needed money because "we can get gloccs smithies 5 to 8 hunnid." (*Id.* at 15.)

Wicker could see from the Device Information that the phone had numerous different numbers going back to at least November 2019, and knew from her training and experience that drug traffickers frequently change phone numbers to avoid law enforcement and silo communications with different parties. (*Id.* at 16.)

Wicker stated her belief based on the above information and her training and experience and the general scope and sophistication of the drug operation that Davis's drug operation had been running from at least January 2020. (*Id.*)

## II.    Discussion

Davis argues that the affidavits supporting the search warrants (Gov't Exs. 5, 6, 8, 13 [Def.'s Exs. A–D, respectively]) did not establish probable cause, and that the good-faith exception to the exclusionary rule should not apply here. (Def.'s Mem. at 6, 9.)

### A.    Standard of Review

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "Probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity'; it 'is not a high bar.'" *United States v. Perry*, 908 F.3d 1126, 1129 (8th Cir. 2018) (quoting *District of Columbia v. Wesby*, 138 S.Ct. 577, 586 (2018)).  Probable cause also "does not require officers to rule out a suspect's innocent explanation for suspicious facts."  *Id.* (quoting *Wesby*, 138 S. Ct. at 588).  The task of a judge presented with an application for a search warrant is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  "The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence."  *United States v. Etheridge*, 165 F.3d 655, 657 (8th Cir. 1999).  An issuing judge "may draw reasonable inferences . . . in determining whether probable cause exists."  *United States v. Wallace*, 550 F.3d 729, 732 (8th Cir. 2008).

In reviewing a warrant after the fact, "great deference" is to be accorded the issuing judge's determination of probable cause.  *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008*)*.  "On a motion to suppress, a district court should not make a de novo determination of probable cause; rather, the decision to issue the warrant is to be

15

upheld if supported by substantial evidence in the record." *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986).

Even if a warrant lacked probable cause, the evidence need not be suppressed so long as the officer's reliance on it was objectively reasonable. This is known as the good-faith exception to the exclusionary rule. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). "Under the good-faith exception, evidence seized pursuant to a search warrant issued by a magistrate that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *Id.* A court considers the objective question of "whether a reasonably well trained officer would have known that the search was illegal despite the issuing judge's authorization." *Id.* (cleaned up).

> [A]n officer's reliance on a warrant would be unreasonable: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable* "; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id.* at 431 (*quoting United States v. Leon*, 468 U.S. 897, 923 (1984)).

## B.   Probable Cause Supported All Four Challenged Warrants

Davis argues the applications for the challenged warrants failed to establish probable cause to believe he was the person mailing the drugs in the envelopes or that evidence of drug crimes would be found at the Beebe and Cinnamon Ridge Trail

16

residences.  (Def.'s Mem. at 7.)  Davis first argues the alleged phone calls between Davis

and MCF prisoners provide little evidence that he was mailing them drugs, because the

jargon and slang in the portions quoted in the affidavits make it impossible to determine

if the conversations pertain to drugs.  (*Id.* at 7.)  The Court disagrees.  While any one

reported conversation might arguably have been insufficient to infer that the conversation

pertained to drugs, the totality of the discussions, including not only the words used but

the surrounding circumstances, make such inferences very reasonable.  For example, a

prisoner in the April 3, 2021, phone call referenced other prisoners "holding" a substance

that looked white, and asked Davis if "it" was the same color and on the same "demo."

MCF mail rooms intercepted mailings sent in late March 2021 with the same brand of

envelope and cotton paper, the same song lyrics printed from the same website on the

paper, and all containing photos with Davis; the paper and photos tested positive for

THC, Cocaine, PCP, and MDMA.  The mailings were addressed to prisoners, four of

who in the beginning of April had phone conversations with Davis about how they had

not received a something that Davis had sent them in the end of March.  It is reasonable

and logical to assume Davis's connection to the drug-laced mailings through the timing,

intended recipients, and content of the mailings and the phone calls.

Davis also argues that it is not credible for the officers to claim they could identify

the sound of a blender in the background of the April 6, 2021, phone call.  (Def.'s Mem.

at 8.)  But Davis did not seek a *Franks* hearing to challenge the veracity of the statement,

which was made under oath, did not seek to offer the recording in evidence, and provides

nothing more than a speculative argument about what it might or might not be possible to

discern from the recording. The statements in a warrant are presumed truthful unless the defendant makes a substantial preliminary showing that the affiant intentionally or recklessly included a false statement and the affidavit would not have established probable cause if the false statement were excluded. *United States v. Mayweather,* 393 F.Supp. 3d 792, 797, *aff'd*, 993 F.3d 1035 (8th Cir. 2021). Davis does not make such a showing here, and in the Court's view, it does not strain credulity that an officer listening to a recording of a call could identify the distinctive high-pitched whirring of a blender's motor in the background while someone was on the phone nearby.

Further, the belief that there was a blender with Davis at the Beebe residence was far from the only evidence supporting a nexus between the suspected drug operation and that location. The April 6, 2021, phone call was with a prisoner who was sent a drug-laced mailing, during which the prisoner asked whether Davis had mailed the "demo" kits into the prison, which Davis confirmed. The same day, Davis received a call from another of the prisoners who was sent a drug-laced mailing, who specifically asked whether Davis was at "Beebe," to which Davis replied yeah, and the prisoner then asked whether Davis was at work already, to which Davis said he was "putting shit together." That same day, Davis had a call with another prisoner who was sent a drug-laced mailing, during which Davis indicated that he had stayed at Beebe overnight and never left the previous day. One can reasonably infer from these conversations and the other information described above that the Beebe residence was known by Davis and his associates to be part of his work of preparing the drug-laced mailings.

Davis next argues that law enforcement observations of Davis mailing some letters

did not establish that he mailed the specific letters addressed to the MCF prisoners. (Def.'s Mem. at 8.)  It is true, as Davis suggests, that some other person *might* have put those letters into the mail at that post office the very same day that Davis dropped off mail at that post office.  But the affidavits for the warrants at issue described how officers heard Davis have a conversation with a MCF prisoner to who a drug-laced mailing had been sent in the past, about getting something mailed out by 5 p.m., the prisoner urging Davis to use next day rather than priority, and how the letters were found near the top of the mail pile a short time after Davis had been seen going into the post office with letters and leaving without them.  The search warrant applications were not required to *prove* Davis was the one who sent those letters.  At the very least, it was reasonable to infer that he was the one who dropped off the letters addressed to the MCF prisoners at the post office he had just visited.

In sum, the facts set forth in the affidavits for the residential and vehicle search warrants described Davis, during the beginning of April 2021, having phone calls with multiple prisoners about the fact that they did not receive something that Davis was supposed to have sent them the previous week, when the prison had intercepted mailings addressed to them containing drug-laced pictures of Davis that were sent at the end of March.  The prisoners and Davis discussed that something in coded language that, based on the surrounding circumstances, experienced officers could infer was about drugs, and the conversations further indicated that Davis stayed at the Beebe residence for a few days at the start of April and was working on something while there.  At least one call from the Beebe residence included the sound of a blender, which the officers stated is

19

often used to prepare drugs, and GPS tracking of Davis's phone placed him there in the days leading up to him sending out envelopes at a post office where officers located letters addressed to MCF prisoners a short time after Davis deposited some mail. The GPS on Davis's phone and car also placed him at the Cinnamon Ridge Trail residence in the days leading up to and immediately before he drove to the post office to send out the mailings. The Court finds that the information set forth in the Beebe and Cinnamon Ridge Trail search warrant applications provided ample probable cause to believe that evidence of drug trafficking would be found in those residences and the Tahoe.

The warrant to search the HP computer was likewise supported by probable cause, as it had the same information described above, plus the fact that the computer was found in the Beebe residence, and that officers searching the residence had found substances testing positive for heroin and opioids as well as blenders and baggies with white and grey residue that are commonly used to prepare drugs, and a loaded revolver. The drug-laced paper in the mailings showed content about civil and criminal proceedings or lyrics from a music lyrics website, and the drug-laced photos were on photo paper, both presumably printed using a computer. The totality of these circumstances provided probable cause to believe that the computer contained evidence relevant to the preparation of the drug-laced mailings and the operation, financials, and participants of the drug trafficking, as well as evidence related to Davis's possession of firearms.

The same is true for the warrant to search the Samsung phone for information dating back to January 1, 2020. Davis did not challenge the warrant authorizing search of the phone data from January 1, 2021 forward, and the subsequent warrant explained why

there was reason to believe evidence relating to the firearms and drugs would be found in the older data.

Because the Court concludes that probable cause supported the warrants, it need not reach the question of whether the good-faith exception to the exclusionary rule would apply. But the Court finds that even if any of the warrants lacked probable cause, none of the concerns that could suggest it was objectively unreasonable for a well-trained officer to rely on each of those warrants are present here. There is no indication that any statements in the applications were false, that any of the issuing judges abandoned their judicial roles, that the warrants so lack indicia of probable cause that official reliance on them was unreasonable, or that the warrants were so facially deficient that no reasonable officer could rely on them. *See Proell*, 485 F.3d at 431.

## III.   Recommendation

Based on all the files, records, and proceedings herein, the Court respectfully recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [ECF No. 28] and Motion to Suppress Evidence Obtained Through Wire Interceptions, Electronic Surveillance and Other Evidence [ECF No. 30] be **DENIED,** and that ECF No. 29 be **DENIED AS MOOT.**

Dated: February 25, 2022

_s/ Hildy Bowbeer_
HILDY BOWBEER
United States Magistrate Judge

## **NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the

District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).